## Supreme Court—Appellate Division, Third Department.

### May, 1902.

## THE PEOPLE v. DANIEL DOODY.[1]

### (72 App. Div. 372.)

1. PERJURY—PENAL CODE, SECTION 96.

> It is perjury, under section 96 of the Penal Code, for a witness to falsely testify that he does not remember what occured in connection with the criminal transaction for which an indictment has been had, where he well knows and remembers facts in regard to the same which are material in determining the guilt or innocence of the accused.

2. SAME—CORROBORATION OF ORAL EVIDENCE.

> In order to convict of perjury upon oral evidence, there must be two witnesses, or one witness supported by corroborating and independent circumstances, except where the proof of the perjury is necessarily based upon circumstantial evidence.

> FURSMAN, J., dissenting.

APPEAL by the defendant, Daniel Doody, from a judgment of the County Court of Kings county in favor of the plaintiff, entered in the office of the clerk of the county of Kings, on the 26th day of December, 1900, upon the verdict of a jury convicting him of the crime of perjury.

This appeal was transferred from the Second Department to the Third Department.

In 1896 and 1897 Theodore B. Willis was commissioner of city works in the city of Brooklyn; Robert W. Fielding was deputy commissioner of city works; William E. Phillips resided in Brooklyn and was a brother-in-law of Theodore B. Willis; Oscar Knapp was a water purveyor; Frederick Milne was an engineer in the water purveyor's office; A. Lawrence Jensen was financial clerk in the comptroller's office; William H. Goff was a superintendent and inspector in the sewer department; Joseph R. Clark was a member of the board of

---

[1] Affirmed 175 N. Y. 165.

aldermen, and William H. Leaycraft was a member of the common council.

The defendant, Daniel Doody, has for many years been engaged in contracting and building in the city of Brooklyn. In 1896 and 1897 Doody was in financial difficulties and could not take contracts in his own name. During said two years contracts for public work were made with various employees of Doody, but which contracts were really for Doody, and there was paid by said city on said contracts to persons so acting in the interest of Doody about the sum of $200,000.

On the 14th day of March, 1898, Doody appeared before the grand jury of the county of Kings and gave evidence in regard to obtaining the said contracts in the name of his employees and in regard to making and carrying out corrupt bargains relating thereto with city officers and employees. The evidence of Doody before the grand jury was to the effect that the city works department not only divided some of the work to be done for the city into small parts for the purpose of giving it to him without advertising for bids, but corruptly aided him in such and other contracts to fraudulently obtain a large amount of money from the city, and that the officers and employees named shared with him in the moneys so fraudulently obtained from the city.

The result of the evidence so given by Doody before the grand jury was that Theodore B. Willis and William E. Phillips were indicted for conspiracy; Theodore B. Willis was indicted for perjury; Robert W. Fielding was indicted for conniving at the audit and allowance of a fraudulent claim against the city of Brooklyn with intent to defraud; Oscar Knapp was indicted for the same offense; Frederick Milne was indicted for the same offense; Joseph R. Clark was indicted for unlawfully taking money for a vote and act in his official capacity as a member of the board of aldermen; William H. Goff was indicted for taking an unlawful fee for performing an official act; A Lawrence Jensen was indicted for the same offense; William H.

Leaycraft was indicted for unlawfully taking and receiving money as a consideration for a vote and act in his official capacity as a member of the common council, and other indictments were found against the said Fielding and the said Knapp.

The defendant in his testimony before the grand jury stated with much detail that he gave to different persons in the city works department the names of various persons to whom contracts were to be let in his interest; that such persons with whom contracts were to be made would wholly represent him and that they would not really have any interest therein.    He further stated in substance that to enable him to get such contracts and to facilitate the payment of the bills to be rendered therefor, he agreed to pay and did pay Robert W. Fielding ten per cent. on each and every contract; that he agreed to pay and did pay Frederick Milne ten per cent. on certain contracts; Oscar Knapp ten per cent. on certain contracts; William E. Phillips ten per cent. on certain contracts in which he stated Theodore B. Willis was also interested; A. Lawrence Jensen certain specific amounts for each warrant as to certain contracts, and five per cent. on certain other contracts; William H. Goff fifty dollars each and every week during the time he was doing work under him as superintendent, and to said Joseph R. Clark and said William H. Leaycraft, each an amount on certain contracts as fully set forth in his evidence before the grand jury.

On the 16th day of May, 1898, Fielding was tried on one of the indictments against him, and on the trial Doody was sworn for the People and testified to giving Fielding the names of persons who would bid on work for him, and that it was agreed between the said Fielding and himself that the contracts to be let to such persons would be the contracts of said Doody.    He further testified on the trial to paying Fielding ten per cent. on the contract in the city works department, which were given to the persons whose names had been so given to said Fielding, including the contract for repaving New Utrecht avenue, and that the ten per cent. so paid said Fielding on that and other

contracts was paid by him by placing the amount in bills or specie in a drawer of the desk of said Fielding while Fielding was alone with him in the room and sitting at his desk.    Fielding was found guilty under that indictment and was sentenced to imprisonment.    An appeal was taken from the judgment of conviction which was unanimously affirmed by the Appellate Division.    An appeal was then taken to the Court of Appeals. In the meantime one of the indictments against Theodore B. Willis and William E. Phillips so found by said grand jury was called for trial, and Doody, on said trial, was called as a witness and again swore to the arrangements made by him with Fielding, Phillips and others, and to the payment of the percentages in pursuance of such agreements.    Other trials were also had and Doody repeated the testimony in regard to contracts and payments as already stated.    The Court of Appeals reversed the judgment of conviction against said Fielding (People v. Fielding, 158 N. Y. 542), on grounds not relating to the merits thereof, and ordered a new trial.    Doody was informed by the district attorney that the Court of Appeals had reversed the Fielding case, and Doody replied that it was the best news he had heard for a long time; that he felt like going out and getting drunk.    He repeated this several times, and the district attorney said, "Do you sympathize with the defendant?" and he said, "Of course I do.    I am sorry to see him convicted."

Fielding was again tried on the 19th day of December, 1899. Prior to that time the district attorney of Kings county had repeated interviews with Doody in preparation for the trial of the various cases, in which conversations Doody repeated to him the statements made by him before the grand jury.    On or about the 16th day of December, 1899, the district attorney had another interview with Doody and informed him that the case against Fielding was about to be tried and that he, Doody, would be called as a witness.    The material part of the testimony of the district attorney relating to such interview is as

follows: " I reminded him of an interview we had previously had when he was in my office when I received telegraphic news from the clerk of the Court of Appeals informing me of the result of the Fielding trial, that the case was reversed, and in which he expressed very great delight.    To my surprise, reminding him of this, I told him I knew he sympathized with the defendant, but he would have to go upon the stand and I wanted to refresh his memory as to the testimony he gave on previous occasions.    He said he would be glad to have me read over portions of his testimony, and I read portions as given before the grand jury as given in the previous Fielding trial and in the Willis trial, particularly portions relating to his payments of money to Fielding, and I asked him was that correct, and as he now recollected it, and he said it was.    That substantially ended that conversation.    I did not see him between this conversation and when I called him as a witness upstairs, not after the last conversation which I expected to be the last conversation before he went on the stand."

The second Fielding case was called for trial on the 19th day of December, 1899, and Doody was put on the stand as a witness and testified as follows: " Q. What conversation did you have upon the subject with Mr. Fielding in reference to parties bidding on work as your representative?    A. I don't remember any conversation I had with him on that subject. Q. You remember giving testimony in the Fielding trial heretofore?    A. Yes, sir. . . .    Q. Do you state that you do not remember having any conversation with him with regard to parties representing you and bidding on work for the city? . . .    A. What do you wish me to say?    Q. State whether you did have such a conversation?    A. I don't remember any such conversation.    Q. Did you tell Mr. Fielding the names of parties, state to him the names of parties who would bid upon work as your representative?    . . .    A. I do not remember having made such a statement to him at all. . . .    Q. Did you pay Mr. Fielding any portion of the money for repaving

over the water main on New Utrecht avenue? A. I don't remember that I did. . . . Q. Did you pay Mr. Fielding any portion of the money for repaving over the water main on New Utrecht avenue? A. I don't remember that I did. Q. Eh? A. I don't remember it. I have no recollection of paying him anything on it. . . . Q. Did you pay Mr. Fielding a portion of the money that you got from this New Utrecht avenue contract? . . . A. I don't recollect having paid him anything on New Utrecht avenue. . . . Q. I ask you now if you will state upon your oath that you did not pay Mr. Fielding part of the money that you got for repaving over the water main on New Utrecht avenue, on New Utrecht avenue contracts? A. I simply say I don't recollect having paid him anything on this bill. Q. What bill? A. New Utrecht avenue. Q. New Utrecht avenue what? Do you state upon your oath that you did not pay him any portion of the money received from that work? . . . A. That is the best answer I can give, I don't remember. Q. I ask you to answer whether you did or did not? I want an answer either that you did or did or that you did not or that you cannot remember. A. I have said I don't remember. That is what I did say. Q. Will you swear that you did not? A. I simply swear that I do not remember. Q. Answer the question whether you did or not? That calls for an answer yes or no? A. I don't remember, it is three or four years ago and I don't recollect what transaction occurred at that time. . . . Q. You can answer that question. Will you swear that you did not pay him anything? A. The best answer I can give to that question is I don't remember paying him anything. Q. You must answer that question yes or no. Will you swear that you did not? A. No, sir, I cannot swear that I did not. . . . Q. Now I will ask you another question, didn't you pay him ten per cent? A. I don't remember having done so. Q. Can you swear that you did not? A. No, sir. Q. Have you not sworn under oath that you did? . . A. I don't remember. Q. Have you not stated under

oath that you paid Mr. Fielding ten per cent? A. I don't recollect that I did. Q. Do you state that you did not? A. No, sir."

The jury acquitted Fielding. Thereafter and on the 5th, 8th, 10th and 12th days of January, 1900, Doody was at the district attorney's office and talked about the several contracts mentioned in his evidence given before the grand jury, but stated that he had forgotten whether he paid any money to said Fielding and others. On the 17th day of January, 1900, the grand jury indicted Doody for the crime of perjury. The indictment of defendant states with particularity the indictment of Fielding, and includes therein a copy of the Fielding indictment and then charges that on the trial of Fielding, under that indictment, " It then and there became, and was material, among other things upon the part of the prosecution in said action, to enquire as to certain relations said to have heretofore existed between one Daniel Doody and the said Robert W. Fielding, the defendant in said action, and to further enquire whether certain conversations had been theretofore had between the said Daniel Doody and the said Robert W. Fielding in reference to parties as the representatives of said Daniel Doody bidding on work then about to be let and contracted for by the city of Brooklyn, the said Robert W. Fielding being then and there a public officer, to wit: deputy commissioner of city works in and for said city of Brooklyn, a part of whose duty it was to take part in the examination and making of such contracts, and in the auditing and allowance of claims and demands upon said city of Brooklyn as appears in the indictment hereinbefore set forth and to further enquire whether the said Daniel Doody had, theretofore, at some time prior to the filing of said indictment against the said Robert W. Fielding, told the said Robert W. Fielding the names of certain persons who would, as the representatives of said Daniel Doody, bid upon work and contracts to be given out and made on account of the city of Brooklyn by said Robert W. Fielding as such deputy

commissioner of city works as aforesaid, and to further enquire whether he, the said Daniel Doody, had at some time prior to the filing of said indictment paid to the said Robert W. Fielding any portion of the money received by said Daniel Doody from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn, for repaving over the water main on New Utrecht avenue in the city of Brooklyn." The indictment then sets forth the trial of said Fielding and that said Doody appeared on said trial as a witness and was duly sworn, and further charges, " And did then and there being so sworn, falsely, feloniously, wilfully and knowingly say and testify among other things in substance that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had theretofore had any conversation with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of said Daniel Doody, and being so sworn as aforesaid the said Daniel Doody did, further, then and there falsely, wilfully, knowingly and feloniously say and testify in substance that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had at any time theretofore told said Robert W. Fielding the names of parties and persons who would as the representatives of said Daniel Doody, bid upon work and contracts to be given out and made on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid; and the said Daniel Doody being so duly sworn as aforesaid, did then and there further falsely, wilfully, knowingly and feloniously say and testify in substance that he, the said Daniel Doody, did not then and there remember that he, the said Daniel Doody, had at any time prior to the filing of said indictment, paid to the said Robert W. Fielding any portion of the money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn for repaving over the

water main on New Utrecht avenue in the city of Brooklyn and that he, the said Daniel Doody, did not then and there remember whether he had or had not paid any portion of such money to him, the said Robert W. Fielding.

" Whereas in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered whether he, the said Daniel Doody, had or had not theretofore had a conversation and divers conversations with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of said Daniel Doody.

" And whereas, in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered that he, the said Daniel Doody, had theretofore had a conversation and divers conversations with the said Robert W. Fielding in reference to parties bidding on work for and in the city of Brooklyn as the representatives of said Daniel Doody.

" And whereas, in truth and in fact, he, the said Daniel Doody, then and there well knew and remembered whether he, the said Daniel Doody, had or had not told said Robert W. Fielding the names of parties and persons who would, as representatives of him, the said Daniel Doody, bid upon work and contracts to be given out and made for and on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid.

" And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered that he, the said Daniel Doody, had told said Robert W. Fielding the names of parties and persons who would, as representatives of him, the said Daniel Doody, bid upon work and contracts to be given out and made for and on account of the city of Brooklyn by said Robert W. Fielding as such deputy commissioner of city works as aforesaid:

" And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered whether he, the said Daniel Doody had or had not, at some time prior to the filing

of said indictment, paid to the said Robert W. Fielding a portion of the said money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn for repaving over the water main on New Utrecht avenue in the city of Brooklyn.

" And whereas, in truth and in fact, the said Daniel Doody then and there well knew and remembered that he, the said Daniel Doody, had, at some time prior to the filing of said indictment, paid to the said Robert W. Fielding a portion of the said money received by him, the said Daniel Doody, from the city of Brooklyn in payment of a claim of his, the said Daniel Doody's, against the city of Brooklyn for repaving over the water main on New Utrecht avenue in the city of Brooklyn.

" And whereas, in truth and in fact, the testimony so given as aforesaid by him, the said Daniel Doody, on the day and year aforesaid, at the Borough, city and county aforesaid was in all respects wilfully and knowingly false, perjured and untrue.

" And whereas, in truth and in fact, the said Daniel Doody, on the nineteenth day of December, 1899, and at all other days and times, well knew that the testimony aforesaid so given by him, the said Daniel Doody, upon said trial as aforesaid, and so sworn to by him as aforesaid, was in all respects wilfully false, untrue and perjured."

The trial of the indictment against the defendant Doody came on to be heard in the Supreme Court on the 10th day of December, 1900, and on such trial the People offered in evidence a copy of the testimony of Doody before the grand jury; a copy of the testimony of Doody on the first trial of Fielding; a copy of the testimony of Doody on the said trial of Willis and Phillips; evidence of the statements made by Doody to the district attorney prior to the second trial of Fielding; a copy of the testimony of Doody on the second trial of Fielding; the statements of Doody to the district attorney subsequent to the

second trial of Fielding, and evidence of the statements made by Doody to the former district attorney of the county of Kings, and then rested.

The defendant produced members of his family, employees and associates to testify to acts and conversations of the defendant occurring a short time previous to his trial, also several experts who testified in substance that Doody was suffering from paresis. The People then produced witnesses to rebut the evidence as to the condition of the defendant's mind and memory, and an expert who testified that the defendant was not suffering from paresis and that the alleged evidences of such disease were the results of the defendant's shamming. The case was then submitted to the jury who found the defendant guilty as charged in the indictment. From the judgment of conviction this appeal was taken.

Jerry A. Wernberg, for the appellant.

John F. Clarke and Martin W. Littleton, for the respondent.

Chase, J.: The statutory definition of perjury, so far as it relates to this case, is: " A person who swears . . . that he will truly testify . . . on any occasion in which an oath is required by law or is necessary for the prosecution or defense of a private right or for the ends of public justice or may lawfully be administered and who in such action . . . wilfully and knowingly testifies . . . falsely in any material matter or states in his testimony . . . any material matter to be true which he knows to be false, is guilty of perjury." (Penal Code, sec. 96.)

On the Fielding trial when it is claimed that Doody committed perjury it was not only material but necessary for the People to show that Doody had furnished Fielding, who was then deputy commissioner of city works, the names of men who would bid on public work as his representatives, but also that

out of the moneys collected by Doody on the contract for repaving over the water main on New Utrecht avenue that he paid to Fielding ten per cent. of the amount of such contract.

So far as appears Doody was the only person other than Fielding, the defendant then on trial, who had direct personal knowledge as to whether such names had or had not been given by Doody to Fielding, and as to whether the corrupt payment had or had not been made as charged in the indictment.    If Doody then had a personal recollection in regard to the matters about which he was interrogated a truthful statement of such recollection was material in determining whether Fielding was guilty or not guilty of the charge against him.

If Doody then well knew and remembered that he did not furnish to Fielding the names of persons who would bid upon work as his representatives, and that he did not pay ten per cent. of the amount of said contract to Fielding, it was necessary for the ends of public justice that he should so testify to the end that the defendant so unjustly charged with crime might be relieved therefrom, and from the danger of conviction on a false charge.

If Doody then well knew and remembered that he did furnish Fielding the names of persons who would bid upon work as his representatives and that he did pay ten per cent of the amount of said contract to Fielding, it was necessary for the ends of public justice that he should so testify to the end that the defendant so on trial should be convicted and punished.

The statutes defining perjury and providing the punishment therefor are designed to prevent the failure of justice.    When a person well knows and remembers what occurred in connection with an alleged criminal transaction, and the facts so well known and remembered by him are material in determining the guilt or innocence of a person accused, it is perjury within section 96 of the Penal Code to falsely testify that he does not remember what occurred in connection with such transaction.

In Regina v. Schlesinger (10 Q. B. 670), the defendant was

indicted for perjury growing out of an action before the sheriff's jury in London.   The defendant was examined upon the trial of the issues as a witness and testified in regard to a certain writing that he thought that the words written in red ink on the writing were not his.   On appeal it was contended that perjury could not be assigned upon the averment of the defendant that he "thought" the words were not in his handwriting. One of the members of the court said:   "If a witness swears that he 'thinks' a certain fact took place, it may be difficult indeed to show that he committed wilful perjury, but it is certainly possible and the averment is as properly a subject of perjury as any other."

Another member of the court said:   "The objection to the assignment of perjury in the first and second counts seems to me to amount to no more than this: that, because it is very difficult of proof, therefore it is bad.   But there would be an easy mode by which witnesses might in many cases escape the consequences of perjury if using the saving words 'I think' made them not indictable."

In People v. Robertson (3 Wheeler's Crim. Cas. 183), it is said:   "In the present case the defendant swears also 'that he has cause to suspect and does suspect' that the wool was stolen by Bishop.   The indictment alleges that he had not cause to suspect and did not suspect that the wool was stolen by Bishop.   The jury have pronounced the charge in the indictment to be true.   Whatever doubts may have once existed, it is now clearly settled that a man may be 'convicted of perjury in swearing that he believes a fact to be true which he knows to be false.'"

An expert may be guilty of perjury in swearing to a false opinion.   (2 Bish. Crim. Law, sec. 878; State v. Henderson, 90 Ind. 408.)

A person who testifies that he believes a certain statement to be true when he has no probable cause for such belief is guilty of perjury.   (State v. Knox, 61 N. C. 312.)

When a person swears positively to the value of goods of which he knows nothing, although his value is correct, he is guilty of perjury. (3 Greenl. Ev. [16th ed.], sec. 200; People v. McKinney, 3 Park. Cr. Rep. 510.)

" Where a man swears that a thing is so or that he believes it to be so, when in truth he does not believe it to be so, the oath is false, though the fact really be as stated." (State v. Cruikshank, 6 Blackf. [Ind.], 62.)

An unqualified statement of that which one does not know to be true is equivalent to a statement of that which he knows to be false. (Penal Code, sec. 101.) The facts stated in the indictment of the defendant are sufficient to constitute a crime.

Where oral evidence is relied upon to convict a person of perjury, it is necessary to produce at least two witnesses, or one witness, supported by corroborating and independent circumstances. This rule arises by reason of the fact that where oath is placed against oath it remains doubtful where the truth lies. It is manifest, however, that this rule does not apply in cases where the proof of the perjury is necessarily based upon circumstantial evidence. It is only necessary in any case to produce evidence sufficient to counterbalance the oath of the defendant and the legal presumption of his innocence. (People v. Stone, 32 Hun, 41.)

That a person can be convicted of perjury without the production of a witness to testify to the falsity of the evidence of defendant on which the indictment rests is held in United States v. Wood (14 Pet. 430). In that case " The defendant was indicted for perjury in falsely taking and swearing ' the owner's oath in cases where goods have been actually purchased,' as prescribed by the fourth section of the supplementary collection law of the first of March, 1823. The perjury was charged to have been committed in April, 1837, at the custom house in New York on the importation of certain woolen goods in the ship Sheridan. The indictment charged the defendant with having intentionally suppressed the true cost of the goods with

intent to defraud the United States.      2. Charging the perjury
in swearing to the truth of the invoice produced by him at the
time of entry of the goods, the invoice being false, etc.      It
appeared by the evidence that the goods mentioned in the entry
had been bought by the defendant from John Wood, his father,
of Saddleworth, England.      No witness was produced by the
United States to prove that the value or cost of the goods was
greater than that for which they were entered at the custom
house in New York.      The evidence of this offered by the prose-
cution was the invoice book of John Wood and thirty-five.
original letters from the defendant to John Wood between 1834
and 1837, showing a combination between John Wood and the
defendant to defraud the United States by invoicing and enter-
ing goods at less than their actual cost; that this combination
comprehended the goods imported in the Sheridan, and that the
goods received by that ship had been entered by the defendant,
he knowing that they had cost more than the prices at which
he had entered them.      This evidence was objected to on the
part of the defendant as not competent proof to convict the
defendant of the crime of perjury, and that, if an inference of
guilt could be derived from such proof, it was an inference from
circumstances not sufficient, as the best legal testimony, to war-
rant a conviction.      Held, that in order to a conviction it was
not necessary on the part of the prosecution to produce a living
witness, if the jury should believe from the written testimony
that the defendant made a false and corrupt oath when he en-
tered the goods."

It follows, therefore, that whether defendant was guilty or
innocent of the crime charged in the indictment, was a question
of fact for the jury to determine.      That the evidence presented
a question of fact for determination by the jury seems to have
been assumed by the defendant at the trial.

The only answer of the defendant to the testimony presented
against him was that his mind and memory had become so im-
paired by disease that he was not legally accountable for his

lack of memory in regard to the transactions with Fielding about which he was interrogated. Neither at the close of the evidence offered by the People, nor at the close of the evidence on the trial, did the defendant move for his discharge. The charge to the jury was fair, and although the questions involved in the issue were fully stated by the court, no exception thereto was taken by the defendant and no criticism of the charge has been made on the argument in this court. Our examination of the testimony leads us to the conclusion that the verdict should not be set aside nor a new trial granted on the facts.

The defendant asserts that the district attorney in his opening to the trial jury was erroneously allowed to call their attention to numerous statements made by the defendant involving independent crimes in which the defendant was a participant. A casual reading of the opening might seem to justify such criticism, but a more careful examination of the whole record convinces us that the evidence referred to by the district attorney was properly received and that the defendant has had a fair trial. The opening of the district attorney is expressly based upon the defendant's statements and confessions. Everything stated by the district attorney in his opening was shown on the trial as stated by him by the receipt in evidence of conceded copies of the defendant's testimony before the grand jury, and on former trials of indictments found upon the evidence so given by the defendant.

The evidence presented on the trial consisted wholly of defendant's statements and the circumstances surrounding the same. It is only necessary, therefore, to consider whether any of such statements and confessions are incompetent and harmful. The question at issue on this trial was not whether the defendant had committed the crime of bribery, but was wholly a question of the defendant's memory in regard thereto. It is somewhat analogous to a question of testamentary capacity.

Prior to 1896 defendant had never been engaged, at least to

VOL. XVI—31

any extent, in doing public work, but according to his sworn statements, in the years 1896 and 1897 he received in the name of others a large number of such contracts, and that in connection with each and every of the contracts so received by others in his interest, there was an agreement by which he was to pay and did pay Fielding ten per cent. of the amount of such contracts, and also an agreement by which he was to pay and did pay a large amount to others who were personally connected with the giving of the several contracts or with the audit and allowance of bills therefor and payment of the same.

The defendant had repeatedly testified in substance that he made these unlawful payments to Fielding in every instance and also to others on each contract, so that the unlawful payments amounted to thirty-five or forty per cent. of the entire amount received by him. If his statements were true, the several contracts were so intimately connected and so interwoven as to be difficult of separation in fact, and almost impossible of separation in the memory of the person who arranged and carried out the unlawful agreements. His statements are to the effect that he was unable to get any public work except by making and carrying out such unlawful agreements. His memory in regard to a single contract was necessarily linked to and associated with the entire scheme by which Fielding was in each instance to receive his percentage. The defendant's statements, theretofore repeatedly made in court and to public officers in regard to the details of such transactions, had a legitimate and immediate bearing upon the strength of the defendant's memory in these intimately associated transactions. All of the defendant's statements referred to by the district attorney in his opening and offered and received in evidence on the trial, related to these several contracts, and were in the nature of a consecutive history of his transactions with the city works department and tended to show his mental powers. The time and purpose of these statements and the severe consequences arising therefrom emphasize their materiality.

A casual statement may be innocently or thoughtlessly made, but the defendant's sworn statements made before the grand jury were so made pursuant to an arrangement between himself and others, including his counsel and the district attorney. The statements made by him before the grand jury were, therefore, so made deliberately, intentionally and positively when he knew that the purpose of his examination was to indict those who, he testified, were associated with him in crime. These statements were reiterated by him on the various trials, and one of the results of the testimony so given by him was that Fielding, on whose last trial the perjury is claimed to have been committed, was on the first trial convicted and sentenced to imprisonment.

Confessedly the defendant had taken upon himself the unenviable position of an informer, with full knowledge of the probable consequences to his associates, and his statements in connection with such information were properly considered by the jury in determining whether on the last trial of Fielding the testimony given by him was knowingly false and untrue.

Prior to Fielding being granted a new trial, there had been a failure to convict some of the others who were indicted on the disclosures made to the grand jury by the defendant. That the defendant sympathized with Fielding was openly stated by him. Notwithstanding defendant had repeated all of the details of the several transactions from time to time under oath and before the district attorney, and that within three days before the last Fielding trial there was read to him his former testimony containing every statement which the defendant now claims the court should have excluded, and that he then discussed the same without showing any impairment of memory, he suddenly loses all recollection as to whether the transactions with Fielding ever took place, and testifies that he has no memory as to whether they did or did not take place. The important question on the trial of the indictment for perjury herein was the strength of the defendant's memory. His

motive for committing the crime of perjury was also a proper subject of consideration.    Apart from the question of defendant having lost his memory by disease, we do not see how a jury could well have come to any other conclusion than that the defendant was guilty of the crime of perjury as charged.    The case was evidently tried upon the theory that the defendant was irresponsible for his statements by reason of his being affected by paresis.    This was a question of fact and has been decided against the defendant.    The defendant urges various other grounds of error, none of which, however, we think could possibly have prejudiced his interests on the trial.

The judgment should be affirmed.

All concurred, except FURSMAN, J., dissenting in an opinion.

FURSMAN, J. (dissenting) :    One Fielding, who was deputy commissioner of a city department of Brooklyn, was indicted and tried for having knowingly approved a false claim against the city.    On the trial the defendant was a witness for the People and is charged with having then falsely testified that he did not remember having had any conversations with Fielding in reference to matters material to the issue then being tried.    The indictment sets out the alleged false testimony in detail and negatives the truth of such testimony in every particular.    I do not deem it necessary to here point out the charges of the indictment more specifically because in my judgment there were errors committed at the trial which compel a reversal of the conviction, and, therefore, the question whether the evidence establishes the guilt of the defendant need not be gone into.    Every person charged with crime is entitled to a fair trial, and however guilty he may be his guilt must be established by proper and competent evidence.    Every improper statement of a prosecuting officer made during the trial which is calculated to influence or prejudice the minds of the jury against the accused, and each item of incompetent evidence having a tendency to lead them to conclude that he is guilty

of the crime charged because he has committed other offenses, constitute imperative reasons for reversing a conviction whether upon the whole case the accused appears to be guilty or not. (People v. Fielding, 158 N. Y. 553; People v. Mull, 167 id. 248, *et seq.*)   In his opening address to the jury the district attorney was permitted, notwithstanding objections and exceptions, to say many things to the prejudice of the defendant which were not and could not by any possibility be properly proved.   It must be borne in mind that on this trial the sole inquiry was whether in truth and in fact the defendant did remember certain conversations with Fielding which he declared on that trial that he did not remember and to which he had testified before the grand jury which indicted Fielding.   The following are examples:  "He (defendant) had to give bribes; he had to give ten per cent. to a man named Milne; he had to pay ten per cent. to Knapp, who was the water purveyor; he had to pay five per cent. to Jensen; all these men could hold up bills unless they got their tribute.   He carried out his end of the contract and they did their end of the work. . . . He had gone before the grand jury and it had indicted his old friends and confederates, and after that he had gone on the witness stand and been denounced by counsel, and hammered and pounded on so it was burned into his memory so he would not forget it the next day or in a lifetime. . . . What happened?  . . .  The trials went on and one man was sent out to the penitentiary; he pleaded guilty."

Again:  "When the time came to get certain work through in the sewer department he had to see a man named Goff, and Goff demanded fifty dollars a week, and he had to pay Goff and he did pay Goff fifty dollars a week to overlook the work and let things go through."

Again:  "In the investigation, when the various warrants turned up, this condition appeared.   Thomas Fraser & Company seemed to be the repository of nearly all the warrants that came directly to Doody; whether it will become necessary to

show you this I don't know.    But it will be revealed by Doody's testimony that the warrants were signed Thomas Fraser & Company.    . . .    The question is, how far is the jury to be deceived if he has attempted to deceive ?    Now, gentlemen of the jury, it will show to some extent the character of this man's mind if you will follow it out.    Why did he create Thomas Fraser & Company ?    Why not take the warrants himself ?    All the warrants given to Finkle, Heyward and Cozzens—all went to him.    He will tell you that he got every cent of the $200,000, except the thirty-five per cent he had to pay out under his agreement.    Every dollar of it came to himself.    Why run it down into this rat-hole, Thomas Fraser & Company ?    Who was Thomas Frazer ?    In his testimony he attempts to say that Thomas Fraser is a brother of some banker in New York.    He is asked, ' did Thomas Fraser get any part of this ?    No, sir.    Was the senior member of this firm anything to you ?    Yes, sir, a partner.    Did he get any part of this ?    He perhaps did get two hundred dollars.'    It means that is a cover.    Every warrant, when they came down to Fraser & Company, they will be up against a stone wall.    Who is Tom Fraser & Company ?    He can't be found."

Again :    " Contracts made and money expended without any authority in law.    What is the cause of it ?    They sent over to the district attorney's office for an investigation, and the investigation proceeds to a certain stage, and immediately we are up against a stone wall.    Who is Fraser & Company ?    Who is Cozzens ?    Who is Finkle, and who is Heyward ?    But a little probing soon revealed in all this filth and rubbish this man Doody.    What was to be done ?    It was soon discovered he was the real criminal.    ' He was the hub, and without him the spokes of the wagon could not remain on.    We sent for his son, as his name appeared on some of the vouchers.    It will appear by his father's testimony that the son came before the grand jury, and he refused to answer.    . . .    I show motive for the responsibility he was assuming, to show that, under that

pressure of his son before the grand jury, he came before the grand jury himself. . . . His son came before the grand jury, as Doody will tell you. The son refused to answer any questions, and was brought into court with the grand jury, and told to answer the questions and sent back. An adjournment was had, and . . . an arrangement was made whereby Doody was to tell his story of his criminality, and all his connection with the frauds and connection of everybody else. . . . He had purchased his safety at the expense of his old friends and confederates. He turned informer upon them, and thus saved himself from punishment for these crimes."

Again: " That was his position in March, 1898, and on his testimony these indictments were all secured against these people. A short while after that Milne, who had been his friend, came into court and pleaded guilty. He was the young inspector out on the works to whom he had paid one hundred dollars. Milne pleaded guilty and was sent to the penitentiary."

These remarks (and others which I have not quoted) were highly improper and well calculated to excite prejudice and harmful bias against the defendant in the minds of the jury. They were unrebuked by the court and objections to them were overruled. The jury must have supposed that they were approved by the presiding justice, especially as wholly incompetent evidence was afterwards admitted, against objection and exception, in proof of these statements. Statements of this character by the public prosecutor in criminal cases have been repeatedly condemned by appellate courts and new trials granted because of them. (People v. Smith, 162 N. Y. 520; People v. Mull, 167 id. 247; People v. Fielding, 158 id. 542, see p. 547 and cases cited; People v. Milks, 55 App. Div. 372.)

The only crime charged in the indictment being perjury, alleged to have been committed in falsely testifying that he did not remember certain conversations with Fielding, the prosecution was allowed to prove by reading from the testimony of the

defendant before the grand jury a number of other distinct and separate crimes having no connection whatever with that under investigation.    Among these are the following: That he paid one Phillips money to induce the commissioner of city works to aid him in defrauding the city; that he entered into corrupt agreement with one Willis, commissioner of city works, to defraud the city; that such agreement had been carried out and the city actually defrauded of large sums; that he entered into a corrupt agreement with one Knapp, who was water purveyor of the city, by which the city of Brooklyn was defrauded; that he had bribed the commissioner of city works to allow him to defraud the city; that he paid one Milne, who was an inspector of the department of city works, the sum of $100 on each warrant he received in payment for the work done by him for the city of Brooklyn for certifying that the work was done properly, although such work was not examined by Milne; that he entered into a corrupt agreement to pay and did pay one Jensen, who was a clerk in the comptroller's office, $200 on each of these warrants to induce said Jensen to mark the same correct; that he entered into another corrupt agreement with Jensen by which he was to pay, and did pay, to Jensen five per cent. on all bills rendered against the city of Brooklyn; that he paid to one Goff, who was superintendent of sewers in the department of city works, a bribe of $50 each week; that he paid various inspectors of the city works department from $5 to $10 at regular intervals as bribes; that he paid one Clark, who was president of the board of aldermen, the sum of $500 as a bribe; that he made a corrupt agreement with one Leaycraft to bribe the aldermen of the city of Brooklyn to pass his bills for cleaning snow from the streets.

Assuming that this evidence was pertinent to some inquiry then pending before the grand jury, it was clearly incompetent on this trial, and necessarily harmful to the defendant by holding him up to the jury as one habitually guilty of defrauding the city of Brooklyn and bribing its officials.    Assuming, again,

that the testimony of defendant before the grand jury as to his conversations with Fielding was competent upon this trial upon the question whether he did or did not remember them upon Fielding's trial, the evidence should have been limited to that. His statements before that body concerning his connection with other crimes were inadmissible for any proper purpose.    This evidence did not tend to prove a motive for committing the alleged perjury, nor the intent of defendant in committing it, nor identity, nor did it tend to prove that the perjury was not accidental, nor that the several distinct offenses thereby proved were part of a scheme of which the perjury was also a part.    In order to render proof of other crimes competent it must fall within one of these requisites.    (People v. Molineux, 168 N. Y. 264.)    It was not rendered competent by showing it to have been testified to by defendant himself before the grand jury.    It was simply proof of other and independent crimes and does not differ in respect to admissibility from evidence of such crimes derived from other sources.    To emphasize this evidence, indictments against these various parties were put in evidence, and proof was allowed against defendant's objection and exception, that one of the persons indicted (Milne) had pleaded guilty and had thereupon been sent to the penitentiary. This, also, was error.    The inquiry was whether the testimony of the defendant on the Fielding trial that he did not remember certain conversations with Fielding was false.    The indictment against Milne was for conniving at the audit and allowance of a fraudulent claim against the city.    What that claim was does not appear.    Neither Milne's admission of guilt nor the character of his punishment were pertinent to the question of defendant's perjury.    Taken in connection with the evidence of this defendant before the grand jury as to his transactions with Milne above alluded to, it was thus made to appear that the defendant was guilty of the crime of bribing Milne, and that Milne had confessed it.    The necessary effect of all of this evidence was to incite in the minds of the jury a belief that the

defendant was habitually criminal in all his dealings with the officials of Brooklyn, and thereby the more easily to persuade them that he was guilty of the perjury with which he was charged.    There is no conceivable connection between these facts, and the evidence was clearly inadmissible.    (People v. McQuade, 110 N. Y. 285, see p. 306; People v. Sharp, 107 id. at 466, *et seq.*)

The admission in evidence of the several indictments against Willis and Phillips for conspiracy, against Willis for bribery, against Knapp for conniving at the audit of a fraudulent claim, against Milne for the same offense, against Clark and Leaycraft severally for accepting money to influence their acts as aldermen, and against Goff and Jensen for accepting bribes, was improper.    An indictment is a mere accusation.    It neither proves nor tends to prove anything even against the defendant named in it.    Even a witness cannot properly be asked whether he has been indicted, because an indictment furnishes no proof of guilt, and to permit an affirmative answer might improperly influence the jury against his credibility.    (Kober v. Miller, 38 Hun, 184, and cases cited.)    These indictments bore no relation to any question involved in this trial.    It was made to appear that they were found upon the evidence of the defendant above referred to and which connected him with each of the offenses named in them.    It is obvious that this evidence could have had no other effect than to improperly influence the minds of the jury against the defendant.

It was error also to permit to be read in evidence the remark of the presiding justice on the first trial of Fielding concerning this defendant to the effect that he was an unwilling witness. The opinion of the judge, thus proved, that the defendant was reluctant to tell the truth on that trial may well have influenced the jury to believe that he testified falsely on the second trial. (People v. Hill, 37 App. Div. 327; People v. Brow, 90 Hun, 509; People v. Corey, 157 N. Y. 332.)    Other errors are alleged which it is unnecessary now to consider, inasmuch as

those already mentioned require a reversal of the conviction.

Judgment of conviction affirmed.

---

## NOTE OF PERJURY, SECTION 96 OF PENAL CODE; SEE 12 NEW YORK CRIMINAL REPORTS, 256.

Not committed by a false oath to a certificate required only by a foreign law.   People v. Martin, 38 Misc. 67.

Upon trial of indictment for perjury, admission of evidence in favor of People that the judge, who presided at the former trial had said at the time " in his opinion, the man (meaning the present defendant) had been guilty of perjury, constitutes reversible error.   People v. Gibson, 13 N. Y. Crim. Rep. 208.

Evidence of attempts to induce other persons to testify falsely in same action, when admissible on trial of defendant upon indictment, charging subornation of perjury.   People v. Van Tassel, 13 N. Y. Crim. Rep. 160.

As to when a deposition states facts from which it may be inferred that the false testimony was wilfully and knowingly given.   See Krauskopf v. Tallman, 38 App. Div. 273.

---

## Supreme Court—Appellate Division—First Department.

May, 1902.

## THE PEOPLE- EX REL. WILSON v. WILLIAM FLYNN, WARDEN, ETC.

(72 App. Div. 67.)

1. GAMBLING—EVIDENCE—PENAL CODE, SEC. 344b.

Section 344 of the Penal Code is constitutional.

2. SAME.

The provision of section 344b of the Penal Code, that possession of " policy slips " is presumptive evidence of possession thereof knowingly and in violation of section 344s, does not apply to the possession and use of such articles, disconnected from their use in