(110 App. Div. 1)

PEOPLE ex rel. MADIGAN v. STURGIS, Fire Com'r.

(Supreme Court, Appellate Division, Second Department. December 29, 1905.)

1. MUNICIPAL CORPORATIONS—FIRE DEPARTMENT—CHARGES AGAINST MEMBER—TRIAL—PRESUMPTIONS.

Where charges against a member of the fire department of the city of New York involved the commission of a felony, he was entitled to the same presumptions in his favor as if the charge had been made against him in a criminal court.

2. PERJURY—CONVICTION—PROOF REQUIRED.

In order to convict of perjury, the evidence must be at least strongly corroborative of the testimony of the accusing witness.

[Ed. Note.—For cases in point, see vol. 39, Cent. Dig. Perjury, §§ 125–132.]

3. SAME—EVIDENCE—SUFFICIENCY.

　　Evidence considered, and held insufficient to show perjury.

4. MUNICIPAL CORPORATIONS — FIRE DEPARTMENT — CHARGES AGAINST MEM-
　　BER—EVIDENCE—SUFFICIENCY.

　　On charges against a member of the fire department in New York
City for having urged members of the department not to appear as
witnesses of what took place on a certain quarrel between members of
the department, evidence considered, and *held* merely to show advice
to keep away from the immediate presence of the combatants at the time
of the quarrel.

　　Certiorari by the people, on the relation of Thomas V. Madigan, to
review a determination of Thomas Sturgis, as fire commissioner of
the city of New York, dismissing relator, an assistant foreman, from
the fire department.　Determination annulled.

　　Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS,
HOOKER, and MILLER, JJ.

　　Luke D. Stapleton (Edward V. Farley, on the brief), for relator.
　　Edward H. Wilson (James D. Bell, on the brief), for respondent.

　　PER CURIAM.　This is a writ of certiorari to review the proceed-
ings of the fire commissioner of the city of New York on the trial of
charges preferred against the relator as assistant foreman in that de-
partment.　In August, 1901, Stuart, an engineer, was tried for an as-
sault upon Grady, a foreman, and dismissed the department.　The re-
lator was a witness against Stuart.　Stuart did not seek a review of the
proceedings.　In 1902 the Legislature passed an act (chapter 554, p.
1321, Laws 1902) that authorized the then commissioner in his dis-
cretion to rehear Stuart's Case and to reinstate him.　The relator
was a witness on the rehearing.　Stuart was reinstated, and thereafter
the relator was tried on charges that he had sworn falsely on these
trials when he testified that he witnessed the quarrel between Grady and
Stuart, that Stuart struck Grady, and that he had advised other mem-
bers of the force not to appear as witnesses of the quarrel.　He was
found guilty and dismissed the department.　The principal charges
against the relator involve his commission of a felony under section 96
of the Penal Code.　Therefore the relator is "entitled to the same pre-
sumption in his favor that would have existed if the said charge had
been made against him in a criminal court."　People ex rel. Campbell
v. Police Commissioners, 13 App. Div. 69, 43 N. Y. Supp. 118, ap-
peal dismissed 153 N. Y. 657, 47 N. E. 1110.　Greenleaf on Evidence
(15th Ed.) vol. 1, § 257, says that to sustain a conviction of perjury
the evidence "must be at least strongly corroborative of the testimony
of the accusing witness; or, in the quaint but energetic language of
Parker, C. J., 'A strong and clear evidence, and more numerous than the
evidence given for the defendant.'　"　See, too, People v. Stone, 32
Hun, 41; People v. Doody, 72 App. Div. 372, 383, 76 N. Y. Supp. 606.

　　The question is whether a verdict of a jury against the relator,
rendered on his trial for perjury, upon the proof in these proceedings,
would be set aside as not warranted by the evidence.　Proof of perjury
was sought to be made by the testimony of Stuart, of Garvin, a member
of the force, and of two outsiders, Devlin and Murphy.　Stuart may be
dismissed with the comment that he was the accusing witness, who must

have admitted his own guilt, and therefore the truth of the relator's testimony, had he not testified against the relator. Garvin testifies that he looked down the stairs of the engine house and saw Stuart and Grady on the ground floor of the house, having an "argument of words"; that he watched them; that as Stuart turned away he saw Grady strike Stuart; that he did not see Stuart strike Grady; and that the relator's testimony to the contrary was untrue. On cross-examination he admitted that his testimony on the original hearing was truthful "as far as it went," and that he withheld facts for his own safety which he disclosed on the rehearing. He also admitted that he had made and subscribed a written statement to Chief Grant, who investigated the matter, in which he said:

"I did not know that Stuart had been hit until Foreman Grady told the doctor on the phone that Stuart was absent, saying his jaw was broken."

And to the doctor's inquiry he says: "I struck him on the jaw." When asked in the statement, "Where was you?" he answered, "I was asleep when I heard the cry, 'Turn out!'"

It is not disputed but that the cry to turn out was subsequent to any blow that passed between Stuart and Grady. We should not attach much credibility to the statement of a witness who admitted that he had not told the whole truth on one trial, but had withheld testimony, who contradicts his formal written statement, and who said therein that he was asleep upstairs during the altercation, and now testifies that he was an eyewitness of the quarrel. Devlin, a lad under 20 years of age, testifies that he stood across the street, about 40 feet away, and saw Stuart and Grady together in the engine house, that words passed between them, and that he saw Grady strike Stuart, but that he did not see Stuart strike Grady. The witness had been convicted of petit larceny. Murphy was a companion of Devlin. Although he testifies that he saw Grady strike Stuart, he was not asked nor does he testify that Stuart did not strike Grady or that he did not see Stuart strike Grady. He testifies that he saw the relator near the engine house about 15 or 20 minutes after the altercation. On cross-examination the following occurred:

"Q. You were sworn before Commissioner Tully on the 4th of September, 1901? A. Yes, sir. Q. Do you remember giving the following testimony: 'Q. You didn't see or hear anything? A. No, sir. I seen Mr. Madigan outside. That is all. Q. You saw him outside the company house? A. Yes, sir. Q. Was that before you heard this loud talking? A. Yes, sir; both before and after.' A. I could not swear to that. Q. Did you swear to that before Commissioner Tully? A. Likely I did. Q. Was it true then? A. I don't believe so. Q. Were not the occurrences fresh in your mind at that time? A. Not as fresh as they were now. Q. Was not your memory better after the thing happened than it is a year or so after? A. No, sir. I can remember better now. * * * Q. What were you at that time working at? A. In Mullen's Hotel. Q. What doing? A. Watering horses. There was not much money in it; but I was getting all I eat and making a dollar or so. Q. Sweeping up the barroom? A. Yes, sir. Q. That was your business at the time? A. Yes, sir. At that time, but it did not last long after this trial started. I got put out of it."

It is rather significant that while these two witnesses testify in effect that the relator was not present at the time of the quarrel, or at least they did not see him, Stuart, Garvin, and Miss Smith testify that the

relator was in front of the engine house at the time. Mallon, a stationary engineer and a man of family, testifies that he was with Devlin and Murphy on this occasion, and states in effect that Murphy could not have seen the occurrence which Murphy testified to.

Firemen Hunt and Dreeke were not eyewitnesses of the affair, and only gave testimony to the admission of Grady that he struck Stuart; but Dreeke also testified that he heard Grady say to Stuart:

"You keep your hands off me, Stuart. I don't want you to hit me any more."

As to the charge that the relator testified as an eyewitness to what he could not have seen, we think that the evidence is overwhelming that the relator was in front of the engine house at the time of the quarrel. The testimony of Devlin and of Smith, either that they did not see him or that he was not seen until some time thereafter, is entitled to little weight as proof that he was absent, in view of the testimony of Stuart himself, of Garvin, of Mallon, and of Miss Smith. The time was a night in August, and the scene of the quarrel was the ground floor of the engine house. Stuart admits that he saw the relator sitting on a seat on the sidewalk in front of the house as Stuart went in. The quarrel followed almost immediately. While Stuart testifies that he did not see the relator at the instant of the altercation, he admits that he did not look especially to see him, and that his testimony as to where the relator was at the time of the altercation was based on the assumption that the relator did not move from the place where the witness saw him when the witness passed on and into the house. Garvin admits that the relator might have seen the affair from an angle; but he does not understand how he could. Stuart admits that the "big door" of the engine house was open at the time. Even if the relator could not view the disputants from his seat, it is perfectly clear that all he had to do was to move from his seat—a most natural action when he heard the war of words. To our mind there is not the slightest question upon the evidence that the relator was in a position to see, or by moving from his seat could gain a place from which to obtain a view of, the disputants. So far as these charges of perjury are concerned, the relator, who had won his way to an assistant foremanship by merit, appeared with an unimpeached character. No charge of any kind had ever been made against him. We think that in the face of the presumption of his innocence the evidence was insufficient to have warranted his conviction of perjury, when tested by the rules heretofore stated.

The other charge is that the relator urged members of the department not to appear as witnesses of what took place. The specifications explain the charge. It is not that he attempted to keep the witnesses of the quarrel from the witness stand, but that he suggested that they would not remain in the vicinity of the quarrel if they did not wish to be witnesses. The language of the specifications is, "Why don't you take a walk, if you don't want to be a witness in this case?" and "Between the two of us we will know nothing, and mind our own business." Garvin testifies that to a group made up, as far as he can remember, of Firemen Hunt and O'Leary and himself, the relator said words to the effect that the boys had better take a walk or go round the corner, something to that effect, "if you

don't want to mix up in this affair as a witness." He testifies that there were citizens outside at that time within hearing, although there was a distance between them and the firemen. He is not willing to testify as to whom the words were addressed. He admits that the altercation was over at the time, and that there was nothing at all important to the investigation that he had not already seen. Further on he admits that he had testified at another trial before the same commissioner that the relator's words were: "Boys, if I were you, I would walk down; not get mixed up in this." and he answered on this trial: "These are the words, I believe." Hunt testifies that the relator remarked, coming toward the group: "He said, if we did not want to be witnesses in the case, to take a walk." Hunt admits that "the fight and everything was all over," and that he had come outside for "not hearing any more, if there was any more to be." O'Leary testifies that the relator did not speak to him before he went to the corner, and that the relator did not say anything to him or to any others in his presence. The relator denies the utterance. When we come to analyze the evidence, we find opposed to the relator's denial, which is supported by the testimony of O'Leary, one of the group, the testimony of Hunt. For the testimony of Garvin as to words of the specification is: First, "Words to the effect that the boys better take a walk, or go down to the corner, something to that effect, 'if you don't want to mix up in this affair as a witness.'" Second, when the specific words were asked for, he said he believed the words were: "Boys, if I were you, I would walk down; not get mixed up in this." If the relator used this language, he did not thereby "urge members not to appear as witnesses," unless his admonition that they "should not get mixed up in it" implied that if they kept out of it they could not be witnesses. Every one admits that the immediate war of words and the immediate fight were over at the time, and even Hunt—who, it may be remarked, did not attempt to quote the words used, for he says: "I can't remember the exact words. I know it was 'take a walk,' That's the best I can give"—testifies that he had come outside, so as not to hear any more, "if there was any more to be." It is difficult to see how such ex post facto advice, even if it was given, could be construed as advice "not to appear as witnesses" of "what took place"; for it already had taken place. We think that even if any advice was given by the relator, in view of the time thereof, the surrounding circumstances, the construction of the language, and the practical contradiction of it by those who heard it, nothing more is shown than advice to keep away from the immediate presence of the combatants, and as the adverse witness, Hunt, puts it, "not hearing any more, if any more there was to be."

We think that the evidence is insufficient to sustain the charge. The determination is annulled, and the relator must be reinstated, with costs.