# SUPREME COURT — APPELLATE DIVISION — FIRST DEPARTMENT.

## April 8, 1921.

## THE PEOPLE v. DOMINICK HENRY.

### (196 App. Div. 177.)

(1) PERJURY*—NO CONVICTION WHERE ONLY EVIDENCE IS ACCUSING WITNESS.

The law is well settled that there can be no conviction for the crime of perjury where the only evidence of the false swearing is that of the accusing witness, who if he had not testified would thereby have admitted his own guilt.

(2) SAME—CORROBORATION.

If oral evidence is relied on to convict one of perjury it is necessary to produce at least two witnesses or one witness, supported by corroborating and independent circumstances. Hence, where the accuser's witness is interested in that if he did not corroborate the accuser, his corroboration of the defendant's testimony would be an admission of his own guilt, his testimony is of little weight.

(3) SAME—SUFFICIENCY OF INSTRUCTIONS TO JURY.

Instructions to the jury and failure to instruct on the trial of one charged with the crime of perjury examined and *held* erroneous.

(4) SAME—CROSS-EXAMINATION.

Cross-examination of the defendant, charged with the crime of perjury, in an investigation before a grand jury to ascertain whether an assistant district attorney had asked and received or agreed to receive a bribe, over the objection of defendant's counsel, as to his acquaintance with police inspectors who had been convicted of conspiracy several years before, was improper where there was no evidence that the defendant had any connection whatsoever with the matters involved.

(5) SAME—PROPOUNDING QUESTIONS CONCERNING CONVICTION OF POLICE INSPECTORS WITH WHOM DEFENDANT HAD NO CONNECTION AS TO "SLUSH FUND" AND NEWSPAPER ARTICLE CONCERNING ACTIVITIES OF DISTRICT ATTORNEY'S OFFICE.

Questions propounded to the defendant, concerning a "slush fund" raised by gamblers for protection and queries as to certain sensational

---

* See notes, Vols. 12, 256; 16, 491; 17, 408; 26, 273; 27, 102.

articles and headlines in newspapers concerning certain activities of the
district attorney's office respecting the police force, were also improper
where there was no evidence of defendant's connection therewith and
such questions tended to show friction between the district attorney's
office and the police department and to bias the jury.

(6) SAME.

It was highly improper to read items and headings from newspapers
which were purely hearsay, as if they imputed verity and were tantamount
to admissible evidence of the matters to which they related.

APPEAL by the defendant, Dominick Henry, from a judg-
ment of the Supreme Court, entered in the office of the clerk
of the county of New York on the 15th day of June, 1920,
convicting him of the crime of perjury, and also, as stated in
the notice of appeal, from the decision of the court overruling
the demurrer to the indictment entered on the 27th day of
May, 1920.

John B. Stanchfield, of counsel (John McKim Minton, Jr.,
and Frank Morse Roosa, with him on the brief; William E.
Murphy, attorney), for the appellant.

William Rand, of counsel (Nathan A. Smyth, with him on
the brief; Charles D. Newton, Attorney-General), for the
respondent.

GREENBAUM, J.:

Defendant was tried under an indictment by the extraordi-
nary grand jury upon the charge of perjury.

The indictment alleges that on March 30, 1920, there was
pending before the grand jury a certain investigation and
inquiry for the purpose, among other things, of ascertaining
whether one James E. Smith, an assistant district attorney for
the county of New York, had asked, received or agreed to
receive a bribe, in violation of section 372 of the Penal Law,
and "whether the said James E. Smith * * * had wil-

fully neglected to perform his duty as a public officer, in violation of Section 1841 or of Section 1857 of the Penal Law, and whether any person or persons had conspired or associated with him (the said James E. Smith) to violate any of the said Sections of the Penal Law." It further sets forth that the defendant was called, appeared and was sworn before the grand jury, and that defendant willfully and knowingly swore falsely to certain matters material to the investigation and inquiry.

The false testimony charged in the indictment was in substance as follows: That pursuant to a suggestion of one James J. Hines, he was introduced to Assistant District Attorney Smith on the evening of February 9, 1918, at the corner of One Hundred and Third street and Amsterdam avenue; that during the course of the conversation that followed Smith stated that he "was going after the Jew gamblers, but would not touch a hair of the head of any Christian who was running a place;" that during a conversation on February 12, 1918, between defendant and Smith, the latter said that "if there were any Christians who were gamblers that he, the said Dominick Henry was interested in, who wanted to do a little business in his district, that it would be all right, so far as he, the said James E. Smith, was concerned and that he would not interfere with them;" that on the evening of the 9th of March, 1918, defendant met Smith by appointment and during the conversation that ensued Smith spoke of an occasion "when it was arranged with Lieut. Costigan of the New York City Police Force and others to trap the said Patrolman Kerrigan taking graft money, he the said James E. Smith had sent for the said Kerrigan and tipped him off and that when the trap was ready to be sprung, Kerrigan was prepared to meet the situation and that the money was to be taken from one Frederick A. Hopler." Defendant also testified that by coincidence, while he and Smith were talking, a man stepped up and spoke to Smith and that he (Henry) was then introduced to him as Mr. Hopler

and that he had never seen Hopler before or since; that on the 11th day of March, 1919, one Joe Heyman informed defendant that " he, the said Joseph Heyman, formerly for a period ran a gambling house for Assistant District Attorney James E. Smith in 105th street," and asked the defendant if he would meet Smith's brother-in-law, one Dennis J. Quinn, which defendant agreed to do at five-thirty P.M., March 11, 1919, at Seventy-second street and Broadway; that Heyman introduced defendant to Quinn at the appointed time and place; that the latter stated that his brother-in-law Smith had sent him to meet defendant " about the advisability of opening some gambling houses, that he was in a position to guarantee that no raids would be made by the District Attorney's office over the head of the said Dominick Henry, that he, the said James E. Smith, was in close touch with the man representing the Rockefeller Institute in the city who was not averse to shutting his eyes to a few things, providing a little change came his way, that the said James E. Smith was in a position to do the said Dominick Henry many favors; that the district of the said Dominick Henry was the best in the city, that we only live once and that this Administration was then in its second year and that in his opinion they stood no chance of being re-elected and that then was the time, if ever, to make a little change, that a few wheels and a few stiff games of poker would never be noticed in a District like the Fourth; that the reporters could publish only what they knew and were only working for a salary and that they could be seen by the right party and that the said James E. Smith knew them all and could take care of that end of the game."

It thus appears that the charge of perjury is predicated upon the testimony of the defendant, concerning three conversations with Smith which defendant testified he held with Smith on February 9, February 12 and March 9, 1918, respectively; a conversation with one Joe Heyman on March 11, 1918, and one on the same date with Dennis J. Quinn.

The defendant at the time of his indictment and trial was an inspector in the police department. On January 23, 1918, he was designated as an " acting inspector " and assigned to duty in the fourth district, the boundaries of which are Forty-second street to One Hundred and Tenth street, Eighth avenue and Central Park West to the Hudson river.

The proofs show that the incidents as to which the defendant testified before the grand jury had according to his testimony and that of Commissioner Enright been substantially embodied in oral reports made by him to the police commissioner shortly after they had taken place, ostensibly in the course of his official duties, and that they were thereafter embodied in the form of affidavits which were turned over to the commissioner. There is no evidence that defendant disclosed the matters set forth in the affidavits to any person other than the police commissioner, and defendant expressly testified upon the trial that no such disclosure was ever made by him.

The testimony tendered by the People with respect to the various interviews testified to by defendant was as follows: As to the first of these, Hines denied that he had introduced the defendant to Smith or that he had ever met them together, and Smith denied both the asserted introduction and the meeting at One Hundred and Third street and Amsterdam avenue, and testified that the first time he ever met defendant was in the latter part of February, 1918, at police headquarters in the office of the defendant.

As to the conversation which defendant swore he had with Smith on February 12, 1918, the latter denied that he had any conversation with him at the time and place stated or that he had ever had any such conversation. There were no independent corroborative circumstances established by the People in connection with the perjury charged, arising out of the defendant's testimony as to the happenings of February 12, 1918. There was thus no corroboration of Smith's testimony. It was a matter of Henry's oath against Smith's oath.

As to the asserted meeting between Henry and Smith on March 9, 1918, at the corner of Sixty-eighth street and Broadway, the latter denied that such a meeting or any such conversation as defendant had testified to, took place and he was corroborated in those respects by Hopler, who testified that he never met Smith and never saw them together. Hopler also testified that he had met defendant shortly after March 9, 1918, at the Sixty-eighth street police station, and that about a week later he also met him at Sixty-eighth street and Broadway, and that Henry at that time asked him whether they were shooting craps at the Chauffeurs' Club, of which the witness then was president. In this connection it appears that Henry testified that he wished to correct his testimony as to Smith introducing Hopler to him, and that the fact was that " Hopler came up and spoke to me about members of my command having stopped what he termed a boxing exhibition in the Chauffeurs' Club." It also appears that defendant's original affidavit concerning this incident made no mention of Smith's introduction of Hopler. Henry's testimony as to meeting Smith on March 9th was corroborated by a witness, Patrolman Dunn, who said that he was in the company of Henry and Smith and heard the conversation about Smith " tipping off Kerrigan in the motor-cycle graft matter." Dunn also testified that he saw Hopler speaking to Henry and then going away, and that thereafter he, Henry, and Smith went to the premises 10 West Seventy-first street occupied by a Mrs. Haber. Defendant was also corroborated by five police officers, who testified that they saw Henry, Smith and Dunn together on the night of March 9, 1918, and one of them, McLaughlin, also testified that he saw Hopler speak to Henry at the corner of Sixty-eighth street and Broadway. In addition to this the witness Hopler upon cross-examination admitted that he knew Kerrigan; that he had had difficulties with him; that on two occasions he paid Kerrigan money when he stopped him and accused him of speeding.

It may also be pertinent to state in this connection that

Smith admitted that sometime in April or early May, at about 9 o'clock P. M., he, defendant and a police officer went to the premises 10 West Seventy-first street and made an investigation and found no violation of law there.

As to the defendant's testimony relative to Joe Heyman and meeting Quinn, Heyman was not produced as a witness, and the only witness for the People in support of the charge of perjury was Smith's brother-in-law, Quinn, who, while admitting that he knew Heyman, testified that Heyman never introduced Henry to him and that he had never met Henry in his life until he saw him in the grand jury room in March, 1920. There was thus no corroboration by any witness or by independent circumstances of the charges of perjury in connection with the Heyman and Quinn conversations.

The law is well settled that there can be no conviction for the crime of perjury where the only evidence of the false swearing is that of the accusing witness, who, if he had not testified, would thereby have admitted his own guilt. (People v. Sturgis, 110 App. Div. 1.)

In People v. Doody (72 App. Div. 372) the court said: "Where oral evidence is relied upon to convict a person of perjury, it is necessary to produce at least two witnesses, or one witness, supported by corroborating and independent circumstances."

Testing the value of the People's proof by the rule that corroboration of the testimony of a single witness is essential, it is evident, in so far as the indictment charges perjury on February 12, 1918, and March 11, 1918, that there could not have been a conviction. Had the defendant moved for a withdrawal of these charges from the consideration of the jury, the motion should have been granted.

This brings us to the consideration of the remaining charge in the indictment involving the happenings on March 9, 1918. The denials of Smith are corroborated by Hopler's testimony, which would, however, be considerably weakened if the jury

accepted the correction made by defendant of his testimony wherein he stated that Hopler had been introduced to him by. Smith, and would have been still further weakened if the jury believed the testimony of Patrolmen Dunn and McLaughlin to the effect that they saw Hopler speak to Henry on the occasion in question, taken in connection with Hopler's admissions that he knew Kerrigan and that he had met Henry at Sixty-eighth street and Broadway on a date later than March 9th.

Besides we find that Henry's testimony was corroborated by Dunn and five other policemen, who so far as the record shows were all disinterested witnesses and that Smith admitted that he entered the premises No. 10 West Seventy-first street with Henry and a police officer but on a date other than March 9th. We are not advised by the record whether the jury found the defendant guilty of perjury in all the respects charged in the indictment or only in one or more.

The learned court charged the jury that they need not find that the defendant was not telling the truth " in each of the details of these various conversations," but if they " have a reasonable doubt as to whether a part of the conversation at a particular meeting took place, but as to any of the facts of the meetings which are denied by Smith, if on any of those meetings which are denied by Smith, you are satisfied beyond a reasonable doubt that they did not occur, then the defendant would be guilty of perjury in swearing that they did occur."

In view of this charge and of the fact that the court did not charge as to the necessity of corroborative proof on the part of the People, it may well be that the jury may have found the defendant guilty of perjury on one or more of the charges in which there was no corroboration whatsoever, and not upon the charges in which there was corroboration.

No request, however, seems to have been made on behalf of the defendant that the court charge the jury as to the legal necessity of corroboration, nor was there any motion made that

the court withdraw from their consideration any of the charges which were not corroborated.

Whether or not this court would be warranted in the interest of justice in reversing this judgment, notwithstanding the omission of counsel to raise the question of corroboration, we need not now decide. In connection, however, with the matters which we are now about to discuss, it is important to bear in mind the character of the proof which we have outlined and the legal situation in which the defendant was put by the failure to eliminate some of the charges in the indictment from the consideration of the jury. It is also important to consider the close issues of fact which were created by the sharp conflict of the testimony of interested witnesses, as bearing upon the importance of a strict observance of the rules of evidence, that no matters be injected into the case excepting such as may be admissible upon the questions of fact to be submitted to the jury.

The learned Attorney-General commenced his cross-examination of the defendant by asking him whether he was acquainted with certain police inspectors named, Dennis Sweeney, John H. Murtha, James F. Thompson and James F. Hussey, who had been indicted and convicted of conspiracy in 1913 during the Whitman administration of the district attorney's office. Objection was duly made by defendant's counsel to such examination, but the court overruled the objections and defendant excepted. There was not the slightest evidence in the case that defendant had any connection whatsoever with the matters involved in the conviction in May, 1913, of those inspectors, or indeed that Assistant District Attorney Smith had anything to do with their conviction.

This examination was followed by the Attorney-General's reading from newspaper clippings with big headlines, coupled with questions as to whether defendant had read these articles. The following are illustrations of the character of these newspaper articles read before the jury and the questions put to the

defendant concerning them over defendant's objections and exceptions: " Q. Well did you read any newspaper articles with big headlines, for instance, to the effect that a $200,000 levy had been made by gamblers for immunity and that a high police official had declared that a slush fund of $200,000 and probably more had been raised to guarantee that gambling interests would be protected, did you read any such thing ? " Not the slightest attempt was made to show defendant's relation to any slush fund or to any immunity of gambling interests. " Q. Were you summoned before the grand jury in connection with the shooting of a gambler named Arnold Rothstein, or sent for ? Did you read in glaring headlines in the newspapers at the time, ' Inspector Henry and aides before Grand Jury to-day; Swann seeking facts about the shooting of detectives by whom Gambler Rothstein is said to have been taken to the hospital ? ' Q. Did you read that Assistant District Attorney James Smith before the grand jury with reference to this Rothstein case had for several hours questioned Captain Charles H. McKinner, and four detectives of Inspector Henry's staff; did you read that or were you otherwise informed of it ? Q. Did you read that this grand jury was going to check bank accounts of police officers in a wholesale inquiry; that it was ignoring Inspector Henry in the investigation of police graft in his district; did you read that ? Q. Mr. Henry, were you aware of the indictment by a Grand Jury of this county in proceedings conducted by District Attorney James E. Smith of Augustus Drum Porter, a Deputy Police Commissioner, an indictment found this year ? "

The indictment last referred to was filed on March 20, 1920.

In the summation of the learned Attorney-General, which is printed in the record on appeal, he stated: " What is the genesis of all this matter ? How did this perjury come to be committed ? Well, there was friction between the district attorney's office and the police department, and they got to calling each other names and it antedated this administration."

Defendant's counsel objected to the statement of the Attorney-General, on the ground that there was no evidence of enmity between the police department and the district attorney's office and that if there were it is not chargeable against this defendant Henry. The court in ruling upon the objection said: " So far as I understand, it is simply a statement made by the Attorney-General as to which there is proof to support that there was friction between the police department and the District Attorney's office, even in the administration of Governor Whitman." Defendant's counsel then said: " What I mean is, if your Honor please, that this friction between the Police Department, if there is such a thing, and the District Attorney's office is not proper evidence against this defendant and therefore not the proper subject of comments by the Attorney-General. (The Court) I do not think that there is any impropriety in the summing up so far made." Shortly after, the Attorney-General stated: " Even under Whitman's administration four police inspectors had been convicted and sent to prison for conspiracy, Sweeney, Murphy and four or five others." Upon objection being made to the remarks just quoted, the Attorney-General continued: " Now I did not bring that out for the purpose of having any of you believe that Dominick Henry was in any way concerned with the conspiracies for which those inspectors were convicted. That was not the object of the question at all. It was simply to show that when the District Attorney's office is putting the inspectors in State Prison, there is bound to be in the Police Department a feeling of apprehension and that the District Attorney's office is not its good friend."

Sufficient has been shown to demonstrate that the purpose of cross-examining the defendant along the lines indicated was either to establish a motive for defendant's alleged false utterances or to create an atmosphere of hostility against the police department which would reflect adversely upon the defendant and those of his witnesses who were police officers.

Saving the Rothstein incident, which occurred in the defendant's inspection district, there was no pretense that either Smith or defendant was in any way concerned with any of the other matters in the newspapers as to which he was interrogated. To search for a personal motive of defendant to injure Smith because of the existence of bad blood and friction between the police department and the district attorney is traveling far afield. The natural effect of calling attention to glaring and sensational headlines in the newspapers would be to inflame the minds of the jury with the idea that the police department was a hotbed of corruption and that the defendant was a fair type of its personnel and that he was inimical to the district attorney. The tendency of such an examination, no matter what answers defendant might give to the objectionable questions put to him, would unconsciously be to bias the jury against him and to lead them astray from the consideration of a criminal charge against him as an individual upon legal proofs upon the charges of perjury and to treat the case as though the police department was on trial.

It seems to us that the following criticisms by this court in People v. Saitta (170 App. Div. 665, 667) are peculiarly appropriate to the cross-examination of the defendant in the instant case: " Second. The main ground upon which we are of opinion that this judgment should be reversed, is by reason of the cross-examination of the defendant himself. He was asked by the district attorney as to his relations with other matters and as to misconduct connected therewith, especially as to his relations with several parties by the names of Musica, whose actions had become notorious in the criminal history of the city. He was shown to have been the attorney for several of these parties, if not all of them, and it was shown that his client had been imprisoned for a considerable period of time. It was true that all charges implied in the questions asked him with reference to his own criminal misconduct were denied by him, but the examination by the district attorney was so

persistent as in itself to present before the jury a distinct charge by the district attorney of irregular and criminal misconduct in connection with his relations with his clients. Not only was this examination so persistently prosecuted by the district attorney as to impress the jury with his belief of the defendant's guilt in his relations with these parties, but the court itself joined with the district attorney in extensive cross-examination of the defendant upon these several matters, giving force and impressiveness to the implied charge which the cross-examination of the district attorney itself presented. This was carried to such an extent as to leave this court with the impression that the defendant was not convicted alone upon this charge of larceny, but in part at least upon other matters not relevant to the issue and to which the defendant could make no answer except that of his own denial."

In addition to what is said in the Saitta Case (supra) we would say that aside from their utter irrelevancy as evidence it was highly improper to read items and headings from newspapers which were purely hearsay, as if they imported verity and were tantamount to admissible evidence of the matters to which they related.

The judgment of conviction should be reversed and a new trial ordered.

DOWLING, LAUGHLIN, SMITH, and MERRELL, JJ., concur.

Judgment reversed and new trial ordered. Settle order on notice.

## NOTE ON OFFICER ACCEPTING BRIBE. PENAL LAW, § 372.

Section 372, Penal Law, specifies three acts, any one of which by itself and alone may be punished as a completed crime. It seems however, that the section should not be so construed as to mean that a person may be punished for receiving a bribe, and also separately and independently for asking and also for agreeing to receive the same bribe, but that these separate acts, when forming a connected series relative to the same subject

matter, should be regarded as constituting a single crime. (People v. Gibson, 191 N. Y. 227, 22 N. Y. Crim. 188, affg. 122 App. Div. 69, 21 N. Y. Crim. 423; People v. Furlong, 140 App. Div. 179, 25 N. Y. Crim. 105, affd. 201 N. Y. 511.)

An indictment formed within five years after the payment of a bribe is not barred by the Statute of Limitations because of the fact that the agreement regarding the receipt of the bribe, and the action influenced thereby occurred more than five ·years prior to the finding of the indictment for the agreement and receipt together constituting but a single crime and the latter being the consummation of the offense the running of the statute will be delayed until that event has occurred. (People v. Gibson, 191 N. Y. 227, 22 N. Y. Crim. 188.)

In order to constitute a violation of this section it is not necessary to show that the defendant asked for or received a bribe in regard to a specific transaction. It is sufficient if it be shown that he agreed to a general course of corrupt official conduct. (People v. Furlong, 140 App. Div. 179, 25 N. Y. Crim. 105, affd. 201 N. Y. 511.

In order to constitute bribery within the meaning of this section it must be shown that the officer received some personal advantage, pecuniary or otherwise, that influenced his action or decision. Thus the fact that a city chamberlain received a loan in consideration for depositing moneys of the city in a certain bank does not constitute bribery in the absence of proof that the loan was in fact an advantage to him. (People v. Hyde, 156 App. Div. 618.)

But where an alderman of a city agrees with a commissioner of another department of the municipal government that in consideration of the reinstatement of an employee previously discharged by the latter officer he will vote in favor of an ordinance affecting such commissioner's department, it may be inferred that he intends to obtain some political or other personal advantage from the reinstatement, and a magistrate will be justified in holding him to answer a charge of violating this section. (People v. Van De Carr, 87 App. Div. 386.)

The fact that notes given to a public officer in pursuance of a corrupt agreement are void, does not constitute a defense for the officer, as this in terms includes a promise to pay and such promise whether verbal or written, is equally within its prohibition. (People v. Willis, 24 Misc. 549.)

A coroner must be regarded as a judicial officer within the meaning of this section and guilty of felony if he accepts a bribe while acting as such. (People v. Jackson, 191 N. Y. 293.)

A police officer is guilty of a violation of this section if he accepts money from the keeper of a gambling house for public protection. (People v. Duffy, 160 App. Div. 385.)

Also, an alderman of a city. (People v. Jaehne, 103 N. Y. 182.)

A commissioner of city works. (People v. Willis, 24 Misc. 549.)