THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* SIDNEY D. TAIT, Appellant.

First Department, February 11, 1932.

*Sydney Rosenthal* of counsel [*Sydney S. Snyder* with him on the brief; *Sydney Rosenthal*, attorney], for the appellant.

*Robert Daru* of counsel [*Leroy Mandle* and *Felix C. Benvenga* with him on the brief; *Thomas C. T. Crain, District Attorney*], for the respondent.

O'MALLEY, J. The defendant at the times herein mentioned was a member of the municipal police force of the city of New York. His conviction of the crime of perjury is predicated upon false testimony given by him in the prosecution of a woman named Icie Sands. The prosecution was for vagrancy under the provisions of section 887, subdivision 4, clause (a), of the Code of Criminal Procedure. The specific charge was that she had offered to commit an act of prostitution. Her trial and conviction took place in the Ninth District Magistrate's Court, city of New York, on April 10, 1929.

The testimony given by the defendant upon the trial of Icie Sands (hereinafter referred to as Sands) was to the effect that she committed the act charged on April 5, 1929, in premises 34 West One Hundred and Thirty-fifth street, New York city; that he and his fellow officer, Baccaglini, at about three P. M. on the day in

question, saw an unknown white man enter Sands' apartment on the ground floor rear of said premises; that at the time they were seated in an automobile on the opposite side of the street directly in front of the hallway entrance; that after waiting about five minutes, they entered the apartment and found the Sands woman in a bedroom with an unknown white man who gave the name of Joseph Brill. Without detailing in full the defendant's testimony, suffice it to say that it was ample to show a full and complete violation of the statute upon which Sands' prosecution was based. She was convicted and sentenced to imprisonment for thirty days.

In support of the indictment the People's evidence showed that no offer of prostitution had been committed by Sands; that one Chile Acuna, a witness called by the People against the defendant upon his trial, theretofore employed as a " stool pigeon " by the members of the vice squad of the department of police, and by the defendant himself, as a member of such squad, was the unknown man employed by the defendant in the Sands' arrest; that by prearrangement with the defendant and Baccaglini, Acuna had preceded them to the premises; that when the defendant and Baccaglini came in shortly after Acuna's arrival in the apartment, Acuna was in a bedroom with Sands; that the latter was fully clothed, seated on a bed and that Acuna was standing engaged in conversation with her; that when the defendant and Baccaglini arrived, Acuna informed them that they had come too soon, as he had not had sufficient opportunity to induce Sands to commit, or offer to commit, an act of prostitution; that thereupon the witness was instructed by the defendant to return to the station house, which he did; that soon thereafter the defendant and Baccaglini brought Sands to the station house under arrest.

Acuna's testimony was supported by that of Sands and by a man named Pridgen who lived with her. Both gave testimony to the effect that it was Acuna who came to the apartment shortly prior to the arrest. The testimony of both of these witnesses differs in its detail. Sands denied that she was in the bedroom with Acuna when the officers arrived and asserted that she was engaged in conversation with him in the hallway. Pridgen's testimony, while differing to some extent from that of the witness Sands, tended on the whole fully to support the claim of Acuna and Sands that the latter did not expose her person to Acuna.

The defendant in his own behalf testified substantially as he did on the prosecution of Sands in the Magistrates' Court. His version of the occurrence in the apartment of Sands on the day of the arrest was substantially corroborated in detail by his fellow-officer, Baccaglini.

The principal issue for the jury's determination was whether Acuna was the unknown white man who figured in the arrest of Sands. If they were warranted in giving credence to the testimony of Acuna, Sands and Pridgen, then they were fully warranted in finding the defendant guilty.

The defendant and his fellow-officer, Baccaglini, strenuously denied that Acuna was the unknown white man on the occasion in question. Both testified that they had never used Acuna as the unknown white man in making any arrest. The defendant claimed that he had met Acuna for the first time on an occasion when he made an arrest in what was referred to as the Bonilla case in February, 1929; that on such occasion Acuna was found among other unknown men in the house where the arrest was made, and that Acuna at that time volunteered to supply him with information with respect to houses of prostitution and gambling resorts; that thereafter he did receive information from time to time from Acuna who would telephone him and meet him by appointment at some designated place upon the street; that at no time had Acuna ever been at the precinct station house to which the defendant was assigned.

Acuna's testimony was to the effect that he had been introduced to the defendant through police channels early in January, 1929, and that he had acted as the unknown man in arrests that the defendant made on several occasions between January and May, 1929. He asserted that he was the unknown man in the Bonilla case already mentioned.

In support of this claim of Acuna strong supporting evidence came from the mouth of the defendant himself. He admitted that the unknown man in that case gave the name of Charles Acuna and that he recorded such name in his records. The jury were fully justified in refusing to accept defendant's explanation of this unusual coincidence. It was to the effect that Acuna was introduced to him on that occasion under the name of Chile and that he did not learn the witness' full and true name until it was disclosed in the newspapers during the investigation of the Magistrates' Courts conducted by the referee designated by the Appellate Division. How the unknown man in the case happened to have the name of Acuna he was unable to explain.

There was other evidence which tended to support Acuna. He testified that he customarily received from five to ten dollars on each occasion when he acted as a " stool pigeon " for the defendant. On the occasion when Sands was arrested he testified that he was paid five dollars by the defendant. In defendant's expense account in connection with the Sands arrest a three-dollar charge for

information and two dollars and fifty cents for meals was concededly entered and made. The defendant's explanation of this charge, notwithstanding that he claims to have made the arrest unaided, was that he paid one dollar to some unknown man to whom he had spoken about the premises, and two dollars and fifty cents to the superintendent or janitor of the house where Sands lived. When the janitor was produced upon the trial the defendant was obliged to admit that he had paid no money to him.

Additional support of Acuna's claim that he was well known to the defendant prior to the Bonilla arrest, is found in another piece of evidence. He testified that on January 30, 1929, in order to give the impression that he was not a " stool pigeon," he testified for the defense in a case in the Magistrates' Court known as the Loubet case; that the defendant was the complaining witness in that case and was in court when Acuna testified for the defense. It appears without dispute that the defendant was such complaining witness and while he denied that Acuna had testified in that case, there was evidence introduced by the People tending to support Acuna's claim that he had so testified.

No doubt this corroborating evidence to which reference has just been made had its effect with the jury. If Acuna had in fact been used by the defendant as the unknown man in other cases, his denial thereof and his attempt to show the least possible relation with Acuna was a fact from which the jury had a right to infer a " guilty conscience." If Acuna had been used in other cases, but in fact had not been used in the Sands' case, there is no reason why the defendant should not have frankly and honestly admitted his true relation with the witness.

In this view of the evidence we are clearly of the opinion that it may not be said that the finding of the defendant guilty was against the weight of the evidence. True it is that the testimony against him comes largely from tainted sources. The assistant district attorney who argued this appeal, as did the assistant who presented it to the jury, frankly conceded that the witnesses Acuna, Sands and Pridgen were disreputable characters. Acuna, in addition to being a confessed " stool pigeon," was twice convicted, once of petit larceny and again of extortion. The witness Sands was a common prostitute who, prior to her arrest and conviction on April 10, 1929, had been arrested by the defendant and convicted and sentenced to imprisonment upon his testimony. Pridgen is no doubt properly described as a " procurer " for the Sands woman.

Granting all this, however, their credibility was a question peculiarly for the triers of the facts who, having had the opportunity of hearing them testify, and observing their conduct and

their manner upon the witness stand, were the best judges of the truth of their testimony. (*People* v. *Gaimari*, 176 N. Y. 84, 94; *People* v. *Sanducci*, 195 id. 361, 367; *People* v. *Seidenshner*, 210 id. 341, 359; *People* v. *Minsky*, 227 id. 94, 98; *People* v. *Becker*, 210 id. 274; *People* v. *Cohen*, 223 id. 406.)

In *People* v. *Minsky* (*supra*, at p. 98) it was said: " Men have been convicted of murder in the first degree by the evidence of admittedly dangerous and degenerate witnesses, law-breakers and professional criminals."

In *People* v. *Cohen* (*supra*, at p. 422) it was said: " We must accept conditions as they exist. Criminals may tell the truth. If after weighing their story, in view of all the circumstances and all corroboration, it seems credible, we need not reject it merely because their reputation is bad or their habits vicious. Such facts are but a warning that caution should be used. For it is also to be remembered that in fixing the blame for such a crime as we are here considering the State is not likely to discover witnesses of high character."

Nor do inconsistencies or disagreements in detail of the testimony of witnesses necessarily condemn the verdict. As said in *People* v. *Lytton* (257 N. Y. 310, at p. 313): " Inconsistencies and uncertainties are not lacking altogether. They are not so vital as to condemn the verdict. A question of fact remains, involving an appraisal by a jury of the credibility of witnesses, and incapable of satisfactory solution by the study of the printed page. (*People* v. *Rodawald*, 177 N. Y. 408, 419, 420; *People* v. *Taylor*, 138 N. Y. 398; *People* v. *Egnor*, 175 N. Y. 419, 425). 'There can be no reversal of the judgment without breaking down the barriers that separate the functions of a jury from those of an appellate court.'"

It is urged upon us that no adequate motive on the part of the defendant to testify falsely against the Sands woman has been shown, whereas there is ample motive on the part of Acuna, Sands and Pridgen to testify falsely against the defendant. But this, like other important facts, was peculiarly for the jury. It is to be borne in mind that where a defendant's guilt is clearly and satisfactorily established, proof of motive in itself is not essential. (*People* v. *Seppi*, 221 N. Y. 62, 70.)

Upon examination of the numerous alleged errors which are urged upon us as sufficient to require a reversal, we find but two that require consideration. It is urged that it was error for the court to permit the witnesses Sands and Acuna to testify to the effect that they were in fact not guilty of crimes of which they had admittedly been convicted. As to his two convictions the witness Acuna was asked respecting them by the assistant district attorney

upon direct examination, and the witness' explanation and assertion of innocence were brought out before he was taken over on cross-examination by defendant's counsel. The explanation offered by the witness Sands of her previous arrest and conviction where the defendant was the complaining witness, was brought out on redirect after the fact of conviction had been first elicited on her cross-examination.

Objection to the witness Acuna being permitted to testify to and explain his convictions on direct examination was made by defendant's counsel. His objection was overruled, and the examination was permitted in the exercise of discretion of the learned trial judge. In the circumstances disclosed we are of opinion that there was no abuse of discretion in this respect. The question was one that related merely to the order of proof, as the defendant's counsel would have been entitled to go fully into the subject upon the cross-examination of the witness.

So far as the right of the witness to explain the facts and circumstances surrounding his conviction, there can be little question. The right of a witness, or a party, when testifying to thus explain a conviction, has been sustained by the Court of Appeals (*Sims* v. *Sims*, 75 N. Y. 466). That case seems to go to the extent of holding that such a witness may in a proper case assert his innocence even in the face of a judgment of conviction. In *People* v. *Michaels* (168 App. Div. 258), however, the right of a witness in this respect was limited to an explanation of the facts and circumstances surrounding the conviction. He was not permitted to protest his innocence once his conviction was admitted.

The limitation thus placed upon a witness in the *Michaels* case has been applied in other jurisdictions, particularly Massachusetts. In *Lamoureux* v. *N. Y., N. H. & H. R. R. Co.* (169 Mass. 338) the plaintiff put in proof of the conviction of one of the defendant's witnesses to discredit him. Upon redirect the witness was asked to state the circumstances of the conviction for the purpose of showing the extent the witness was involved in the act and to show the circumstances. The evidence was excluded. Mr. Justice HOLMES, writing for the court, stated (p. 340): " Logically, there is no doubt that the evidence tending to diminish the wickedness of the act, like evidence of good character, which is admissible, does meet, as far as it goes, the evidence afforded by the conviction, since that discredits only by tending to show either general bad character, or bad character of a kind more or less likely to be associated with untruthfulness. *Gertz* v. *Fitchburg Railroad*, 137 Mass. 77, 78. Nevertheless, the conviction must be left unexplained. Obviously the guilt of the witness cannot be retried.

*Commonwealth* v. *Gallagher*, 126 Mass. 54; *Gertz* v. *Fitchburg*, 137 Mass. 77, 80. It is no less impossible to go behind the sentence to determine the degree of guilt. Apart from any technical objection, it is impracticable to introduce what may be a long investigation of a wholly collateral matter into a case to which it is foreign, and it is not to be expected or allowed that the party producing the record should also put in testimony to meet the explanation ready in the mouth of the convicted person. *Yet if one side goes into the matter, the other must be allowed to also.* We have considered the question as if the offer had been in the most guarded form. As it was made, it was almost identical with the one excluded in *Commonwealth* v. *Galligan*, 155 Mass. 54, 56." (Italics ours.)

Under the rule in the *Lamoureux Case (supra)* defendant's counsel was no doubt within his rights in requesting that he be permitted to call the complainant in one of the cases where Acuna had been convicted for the purpose of controverting Acuna's claim of innocence. However, we are of opinion that whatever error was thus committed in the court's refusal of the request made, was fully cured. During the trial and in the court's main charge the jury were instructed that, notwithstanding the explanations and protestations of the witnesses Acuna and Sands, the judgment of their convictions was binding and conclusive upon the issue of their guilt. In referring to their testimony in the main charge the court stated: " The Court allowed an explanation by these witnesses as to the circumstances under which they were arrested and their protestations of innocence. I charge you that the conviction is a valid and binding judgment and remains as an adjudication of the facts.

" In determining what weight and what value you will attach to such witnesses' testimony, you may give their explanations and protestations such weight as you may deem proper. In any event, however, you must bear in mind that such explanations and protestations of innocence cannot overcome or destroy the validity of the judgment of conviction. As a finding of guilt that judgment must remain unaffected and unimpaired and absolutely binding and effective as an adjudication of guilt."

The other alleged error relates to what is termed misconduct on the part of the assistant district attorney who prosecuted the indictment against the defendant, which misconduct, it is asserted, amounted to depriving the defendant of a fair trial.

It appears that, after the People rested, the assistant prosecutor, accompanied by a photographer and a police officer from the district attorney's office, went to the premises 34 West One Hundred and Thirty-fifth street for the purpose of taking measurements

with a view to showing that the defendant and his fellow-officer, Baccaglini, did not have a clear view of the entrance to the Sands' apartment at the time the defendant claimed that he saw an unknown man enter it. On the following morning the request of the prosecutor to reopen the case for the purpose of offering this proof was granted. No objection to such procedure on the part of the defendant's counsel was taken.

It appears that the police officer who accompanied the prosecutor to the premises in question was called to testify to observations made. When it developed in the course of his examination that he admitted " poor eyesight " the prosecutor himself voluntarily took the stand to testify to what he had observed. No objection whatever was raised by defendant's counsel, and no complaint, during the summation or at any time, was made that an unfair advantage had been taken of the defendant by the assistant district attorney having testified.

It is now urged for the first time upon appeal that this alleged misconduct on the part of the prosecutor was so prejudicial in its nature that a new trial should be granted upon this ground alone.

We are not prepared to condemn in so severe a measure the conduct of the prosecutor. At most it was but a mere error of judgment on his part, and in our view no prejudice to the defendant resulted. It is true that ordinarily an attorney representing one side or the other should refrain from taking the stand in support of his case, and even avoid placing himself in a position where his testimony will be required. (*Fontana* v. *Fontana*, 182 App. Div. 717.) However, as we view the situation here presented, the action of the assistant district attorney was neither deliberate nor preconceived. He was confronted with a sudden emergency where material testimony which he had expected to produce through another witness suddenly failed in its efficacy. Because of an unforeseen circumstance, either the evidence had to be supplied by the prosecutor himself or a further adjournment taken to have additional observations made.

In the circumstances our conclusion is that the matter is not of such serious consequence as to require either condemnation of the assistant district attorney or a reversal of the judgment. The defendant was represented on the trial by able counsel long experienced in the trial of criminal cases. Lack of protest or objection on his part to the testimony in question is strong evidence, indeed, that the incident was considered of little moment on the trial. In fact in his summation to the jury, defendant's counsel stated: " We have no cause to complain, Gentlemen of the Jury, about the trial of this case. This case is a beautiful illustration

of what is meant by a fair and impartial trial under the Constitution of the United States and under the laws of the State of New York. I have no cause for complaint in the conduct of my friend here, Mr. Wallace [Assistant District Attorney]."

The testimony in question was material and entirely competent. A sufficient foundation for its introduction was laid. The evidence showed that there had been no change whatever in the physical construction of the premises. The only variance in conditions between April 5, 1929, and the time when observations were made on behalf of the prosecutor, related to visibility merely. The jury well understood that they were required to take note of these slight changes in conditions.

So far as the motion for a new trial is concerned, we have examined the evidence offered in support thereof, and in opposition thereto, and we have reached the conclusion that the learned trial judge committed no error in denying the motion made.

It follows that the judgment and order appealed from should be affirmed.

FINCH, P. J., and TOWNLEY, J., concur; MERRELL and SHERMAN, JJ., dissent.

MERRELL, J. (dissenting). I dissent from a majority of the court whereby the conviction of the defendant is about to be affirmed, and vote for reversal and that the defendant be granted a new trial upon the grounds: *First*, that the verdict of the jury, finding the defendant guilty of the crime charged, was contrary to the weight of the evidence, and that the evidence at the trial was insufficient to show the defendant's guilt beyond a reasonable doubt; *second*, that during the trial errors occurred which prejudiced defendant's rights and which require a reversal of the judgment of conviction; and *third*, that the defendant was denied a fair trial.

The defendant, a member of the vice squad of the New York police department, was charged with giving false testimony in Magistrates' Court in connection with the prosecution of one Icie Sands, an alleged vagrant and prostitute. The alleged prostitute was found guilty of vagrancy in Magistrates' Court and sentenced to imprisonment. Subsequently, at an inquiry instituted by a referee appointed by this court, the alleged negro prostitute, Icie Sands, one Matthew Pridgen, claimed by her to be a cousin but who turned out to be simply an habitue and procurer of her brothel, and one Chile Acuna gave testimony to the effect that the said Icie Sands was one of many unfortunate women who had been framed by the police and that the defendant had sworn falsely in the prosecution of the alleged prostitute in Magistrates' Court.

Upon the testimony of the three witnesses mentioned, the defendant was indicted by the grand jury of New York county for the crime of perjury. His trial under the indictment resulted in the judgment appealed from.

The defendant entered upon the trial under a presumption of innocence. It must be borne in mind that the trial of the defendant in Court of General Sessions was held soon after the revelations as to the alleged "framing" of dissolute women by members of the vice squad of the New York police department, and at a time when public feeling ran high and prejudice had been aroused against members of the vice squad for such claimed dishonest practices. A sensational public press, ever ready to seize upon the spectacular, did much to influence the public mind against honest peace officers as a whole for wrongful acts committed by a comparative few. It was at such a time and under such unfavorable circumstances that the defendant was indicted and tried. There was not a scintilla of evidence, nor was there any claim, that the defendant had received anything as a consideration for the alleged false testimony which he was charged with having given in Magistrates' Court. The testimony was merely that he had sworn falsely. For six and a half years the defendant had been connected with the police department of the city of New York, and prior thereto he had been an employee of the health department of the city. He bore an unblemished reputation, and his official service had been without a stain. At the trial, superior officers and others, including a chaplain of the police department, all testified to his good reputation for truth and veracity. Notwithstanding an entire absence of motive for false swearing, his blameless past record, and the testimony of his superior officers and others as to his good character, he was convicted by the trial jury upon the uncorroborated testimony of a negro prostitute, a negro inmate of her establishment, and that of a self-confessed thief. The last mentioned — the witness Acuna — was a self-confessed criminal. His testimony at the trial was such that the jury was not justified in placing the slightest credence thereon. He posed as a so-called "stool pigeon" for the police in the alleged "framing" of lewd women. Acuna admitted on cross-examination that he received seven dollars a day, excluding Sundays, from the so-called Seabury investigation, and also had received from another source a like sum of seven dollars a day for testimony which he gave at such investigation. He also admitted, on cross-examination, that he received $400 from the New York *Daily News* and $2,000 from the New York *Evening Graphic*, "tabloid" publications of New York city, to enable the so-called purveyors of news to

obtain, to use the vernacular, a " scoop " over less sensational news-papers. His testimony was contradictory and evasive. His admissions branded him as a creature of the lowest type. His testimony failed to coincide in material particulars with that of Icie Sands. The testimony of this woman and of her consort, Pridgen, was no more reliable. And yet it was upon the testimony of this trio that the defendant was convicted. The jury's verdict in this case upon such testimony can only be explained by the fact that the circumstances were such that the defendant was not accorded a fair trial. There were errors committed at the trial which, in my opinion, require a reversal of the judgment of conviction, and that the defendant be granted a new trial. But one or two of these errors need be mentioned. The witness Acuna was permitted by the trial court, against the objection of defendant's trial counsel, to explain the circumstances under which he had been previously convicted of the crimes of larceny and of attempted extortion, and to testify that he was not, in fact, guilty of such crimes with which he was charged. The woman, Icie Sands, was likewise permitted, against the objection of defendant's attorney, to explain a prior conviction on her plea of guilty to a charge of prostitution. The court charged the jury that, in determining the weight to attach to the testimony of these witnesses, it might take into account their explanations and protestations of innocence. I think the receipt of such testimony and the charge of the trial court with reference thereto, that the jury might give such explanations such weight as the jury deemed proper, were errors prejudicial to defendant's rights.

A further grave error, which deprived the defendant of a fair trial, occurred under the following circumstances: After a protracted trial, lasting many days, and after the testimony had been declared closed, on March 10, 1931, the case was adjourned until the following morning, when summation of counsel was to be made. The justice presiding at the trial, on the reassembling of court on the morning of March 11, 1931, in his discretion, permitted the assistant district attorney to reopen the case and introduce further evidence contradictory of the defendant's testimony that just prior to the raiding of the Icie Sands' apartment he, in company with a fellow-police officer, had stood opposite the Sands' apartment and had seen an unknown man enter the same. The assistant district attorney evidently felt that his case was a weak one and that, unless he could show that defendant could not see a person entering said apartment from the place where the defendant and his fellow-officer stood, the defendant was likely to be acquitted by the jury. Accordingly, the assistant district attorney went to the place in question in the

late afternoon of March tenth and there, in company with a police officer assigned to the district attorney's office, by the name of Leech, attempted to conduct certain experiments. These experiments were conducted at a later hour of the day from that at which the defendant had testified he observed the unknown man enter the Sands' apartment and at a time of year when the light was not the same. The experiment was conducted under conditions, of light and visibility, quite different from those prevailing when the defendant testified as to what he had seen. While it is entirely permissible to conduct experiments at a later day, the conditions should be essentially the same. The defendant testified that he had observed the unknown man entering the building on April 5, 1929, between two and half-past two o'clock in the afternoon. The experiments conducted by the district attorney and his companion were conducted on March 10, 1931, at a quarter to five in the afternoon, a time of the year and of the day when the conditions of light were much poorer than at the time when defendant testified he made his observations. It was said by Curtis in his work on the New York Law of Evidence (§ 805, at p. 611) that " To render experiments admissible, however, the conditions must be essentially the same as those in existence at the time of the occurrence of the fact sought to be demonstrated." (See, also, Wigm. Ev. § 460.) In *People* v. *Fiori* (123 App. Div. 174, 185) it was held that in order to render an experiment admissible, the circumstances and conditions must be similar. In that case the court said: " It is undoubtedly true that evidence of this character is admissible, and very commonly resorted to, but the circumstances and conditions must be similar." In Richardson on Evidence (4th ed. § 170, p. 120) the textwriter states: " Thus, tests as to whether a thing could be seen or heard, or a person identified, under given circumstances of time and place, are ordinarily rejected. The evidence of tests in such cases is rejected because it is practically impossible to prove that the tests were made under exactly similar conditions as to light, sound, atmospheric conditions, etc. If it should be satisfactorily established that the tests, in every particular, were made under like conditions that prevailed at the time in question, the tests would be competent and admissible."

On the morning of March 11, 1931, when the assistant district attorney, upon his application, was permitted to open the case, he first put Leech upon the witness stand, but Leech failed to meet the emergency and, under a plea of poor eyesight, was unable to give testimony to contradict the defendant. Thereupon the district attorney, who had throughout conducted the trial of the defendant in behalf of the People and who was about to sum up the People's

case, evidently disappointed that Leech had failed to support his contention, himself took the witness stand and testified, in effect, that it was a physical impossibility for one to see a person enter the Icie Sands' apartment from the point where the defendant had testified he stood when he saw the unknown man enter said apartment. We thus have the situation of the district attorney, a quasi-judicial officer supposed to act with entire impartiality in the discharge of his official duties, when Leech (the police officer assigned to his department) would not contradict the defendant in his testimony, in a last attempt to bolster up his case, taking the witness stand himself and testifying to his experiments conducted the evening before under conditions of light quite different from those prevailing when the defendant testified he had made his observations. The zeal of the district attorney, in his endeavor to save his case, was, in my opinion, quite unwarranted. While prosecuting officers, in the discharge of duty, are not to be criticised for their zeal in attempting to secure convictions of those on trial for crime whom they believe to be guilty, and while undoubtedly the assistant district attorney in this instance was actuated by honest motives, his action in taking the witness stand himself in behalf of his client worked a serious wrong to the rights of the defendant. While the assistant district attorney in this case is not to be charged with intentional wrongdoing, the fact remains that his act must have had a most potent effect upon the jury and may well have resulted in the verdict in favor of the cause he so zealously espoused. Such practice was entirely contrary to the Canons of Ethics of the New York State Bar Association and the Canons of Ethics of the American Bar Association, and requires reversal. In canon 5 of the Canons of Ethics of the New York State Bar Association it is stated: " The primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done. He should avoid oppression and injustice of any kind whatsoever."

Canon 19 of the New York State Bar Association's Canons of Ethics provides as follows: " When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in Court in behalf of his client."

The Canons of Ethics adopted by the American Bar Association are substantially the same as those of the New York State Bar Association.

Had the assistant district attorney desired to disprove the testimony of the defendant and his ability to see, from the point where

he stood, one entering the Icie Sands' apartment, he could have done so with witnesses other than himself. Having taken the witness stand himself in what, it seems to me, was a failure to observe the standards of ethics set up by the New York State Bar Association and by the American Bar Association, the assistant district attorney then proceeded, not to leave the trial of the case to other counsel, but chose himself to continue in the trial and to sum up the case in behalf of the People. Whatever virtue there may be to the Canons of Ethics adopted by the bar associations, there was a plain violation thereof in this case.

The testimony of the assistant district attorney directly contradicts the testimony of defendant. Here the defendant was on trial for perjury, and this sworn officer of the law saw fit to take the witness stand and to give testimony to the effect that defendant was committing perjury on this very trial. The effect of such testimony upon the jury must have been most prejudicial to the defendant. The jury must have given great weight to the testimony of this quasi-judicial officer, supposedly acting with impartiality between the People and the accused, and who, immediately after giving such testimony, summed up the case for the People.

In *People* v. *Fielding* (158 N. Y. 542), Judge VANN, writing for the Court of Appeals, in discussing the conduct of a public prosecutor in the trial of a criminal action (at p. 547), referred to such prosecutor as " a *quasi*-judicial officer, representing the People of the State, and presumed to act impartially in the interest only of justice." Judge VANN then continued: " If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment."

Numerous decisions of our courts have placed the stamp of their disapproval upon, and judgments of conviction have been reversed by reason of, conduct of prosecuting officers much less prejudicial to the rights of defendants on trial for crime than that resorted to at the trial here under review. (*People* v. *Teiper*, 186 App. Div. 830; *People* v. *Manganaro*, 218 N. Y. 9; *People* v. *Wolf*, 183 id. 464, 468; *People* v. *Fielding*, 158 id. 542, 546; *People* v. *Greenwall*, 115 id. 520; *People* v. *Esposito*, 224 id. 370, 377; *People* v. *Henry*, 196 App. Div. 177; *People* v. *Mull*, 167 N. Y. 247, 248.) I think the action of the assistant district attorney in this case was unwarranted. The defendant's rights were thereby prejudiced and the right of a fair trial was denied him. The error

was a vital one and should not be lightly glossed over or ignored under the provisions of section 542 of the Code of Criminal Procedure. That section is only applicable where mere technical errors have occurred not affecting substantial rights of a defendant. The charge against the defendant was a serious one. If he was guilty of the crime of which he was accused, he should be punished. But he should be given a fair trial, and convicted upon evidence free from error. That he did not have in the trial here under review.

The judgment of conviction should be reversed, and the defendant granted a new trial.

SHERMAN, J. (dissenting). Upon the evidence in the record defendant's guilt was not so clearly established that the errors committed at the trial should be overlooked under section 542 of the Code of Criminal Procedure.

I, therefore, dissent from the affirmance of the judgment of conviction and vote for its reversal and for the granting of a new trial, in the interest of justice.

Judgment and order affirmed.